# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

BARTRAM YIHNI DABNEY,

Plaintiff,

- v -

Civ. No. 9:11-CV-273
(BKS/RFT)

DONALD SAWYER, Executive Director, Marcy Mental
Health Hospital, JOANN WALDRON, Chief of OMH Satellite,
Clinton Correctional Facility, DR. BERGREN,[1] Psychiatrist,
Clinton Correctional Facility, DR. LEE, Medical Doctor, Clinton
Correctional Facility, DR. FAROOKI, Dentist, SARA NEPHEW,
OMH Therapist, Clinton Correctional Facility; RON DUMONT,
Nurse, Clinton Correctional Facility, DR. BATTU, Psychiatrist,
Great Meadow Correctional Facility, JONATHAN NOCERA,
Assistant Inspector General, Department of Correctional
Services; VIRGINIA DONOHUE, Social Worker, Great
Meadow Correctional Facility, THOMAS FOLEY,
Corrections Officer, Clinton Correctional Facility,

Defendants.

**APPEARANCES:**

**OF COUNSEL:**

BARTRAM YIHI DABNEY
*Pro se* Plaintiff
93-A-7310
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

HON. ERIC T. SCHNEIDERMAN
Attorney for Defendants
Attorney General of the State of New York

JAMES B. McGOWAN, ESQ.
Assistant Attorney General

---

[1] Berggren is properly spelled with two "G"s. Dkt. No 89-4, Jean Berggren, M.D., Decl., dated June 24, 2014. Hereinafter, the Court will use the correct spelling to refer to Defendant Jean Berggren.

The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

## I.  PROCEDURAL HISTORY

On December 30, 2010,[2] *pro se* Plaintiff Dabney, while incarcerated at Clinton

Correctional Facility, filed a civil rights action, pursuant to 42 U.S.C. §§ 1983, 1985,

and 1986, alleging a number of constitutional violations against the Defendants

stemming from his confinement at Great Meadow Correctional Facility and Clinton

Correctional Facility.  *See generally* Dkt. Nos. 1 &1-1, Compl.[3]  On September 30,

2013, the Honorable Lawrence E. Kahn, Senior United States District Judge, issued

an Order granting, in part, Defendants' Motion for Judgment on the Pleadings and

providing Plaintiff leave to file an amended complaint.  Dkt. No. 60.  However,

Plaintiff did not file an amended complaint, thus, the following claims were dismissed

in accordance with the September 30, 2013 Order: (1) Plaintiff's allegation that

---

[2] The Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he or she hands the papers to the prison authorities for transmittal to the court.  *Dory v. Ryan*, 999 F.2d 679, 681-82 (2d Cir. 1993), *modified on reh'g*, 25 F.3d 81 (2d Cir. 1994).  It is presumed that a prisoner handed the pleading to the prison guard on the date he signed the complaint.  *Shaw v. Superintendent Attica Corr. Fac.*, 2007 WL 951459, at *3 n.3 (N.D.N.Y. Mar. 28, 2007).

[3] Plaintiff submitted what appears to be two Complaints at the time he filed this suit. Both documents are exact replicas, except that one is entirely handwritten with sequentially numbered paragraphs and bears Plaintiff's notarized signature.  For convenience, the Court will cite to the handwritten Complaint.

Defendant Nocera conducted an improper investigation; (2) Plaintiff's allegation that Defendant Foley provided him with inadequate winter clothing during recreation; and (3) the claim that Dr. Lee acted with deliberate indifference by failing to x-ray Plaintiff's sore rib. The following claims remain in this action: 1) deliberate indifference claims against Sawyer, Waldron, Donohue, Battu, Berggren, and Nephew for inadequate mental health treatment; 2) deliberative indifference claim against Dr. Lee for failing to adequately treat Plaintiff's Hepatitis C; 3) deliberate indifference claim against Dr. Farooki for inadequate dental care; 4) deliberate indifference claim against Nurse Dumont for delaying urgent dental care; 5) § 1985 conspiracy claim against Defendants Waldron and Battu; 6) § 1986 failure to protect claim against all of the Defendants; and 7) retaliation claims against Defendants Battu, Donohue, Berggren, Waldron, Sawyer, and Nephew.

Presently, Plaintiff has withdrawn his racial discrimination claim as well as his conspiracy claim against "all" of the Defendants, except for Battu and Waldron. Dkt. No. 92, Pl.'s Resp. in Opp'n, at p. 5. In addition, on April 17, 2014, Defendants Savage and Besaw were terminated from this action pursuant to a Stipulation and Order of Discontinuance Pursuant to Rule 41(A). Dkt. No. 85.

On July 10, 2014, the Defendants moved for summary judgment. Dkt. No. 89. On July 25, 2014, Plaintiff filed a Response in Opposition thereto. Dkt. No. 92. On

July 31, 2014, Defendants filed a Reply. Dkt. No. 93. On August 11, 2014, Plaintiff filed a Sur-reply. Dkt. No. 94.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see*

*also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party. The following facts are undisputed.

## B. Material Facts

Plaintiff claims that on May 21, 2010, he was assaulted at Great Meadow by eighteen New York State Department of Corrections and Community Supervision ("DOCCS") employees. Compl. at ¶¶ 30-31. Plaintiff submitted a letter to DOCCS's Inspector General's Office complaining about the alleged assault. Dkt. No. 89-11, Jonathan Nocera Decl., dated April 15, 2014, at ¶¶ 1 & 3. The Inspector General's Office assigned Senior Investigator Nocera to investigate Plaintiff's complaint. *Id.* at ¶ 1. In connection with the investigation, Nocera learned through interviews with staff that, during a pat frisk, a weapon was found on Plaintiff. *Id.* at ¶ 7. According to the staff witnesses, Plaintiff then struck one of the officers in the head with his elbow. *Id.* Staff admitted struggling with Plaintiff to place him in restraints, but they all denied kicking and assaulting him. *Id.* at ¶¶ 8-9. Plaintiff was found guilty of several infractions relating to this incident. *Id.* at ¶ 11. Plaintiff was sentenced to twelve months in the Special Housing Unit ("SHU") with a corresponding loss of privileges and a recommendation to reduce his good time credit. *Id.* On July 1, 2010, Plaintiff was transferred to Clinton and housed in Clinton's SHU for the same infraction. Dkt. No. 89-13, JoAnne Waldron Decl., dated July 1, 2014, at ¶ 5; *see*

*generally* Compl. ¶¶ 41-42.  On September 9, 2010, Plaintiff commenced a federal civil rights action in which he refers to the alleged May 21, 2010 assault.  *See* Complaint, *Dabney v. Fisher*, 9:10-CV-1109 (GTS/TWD) (N.D.N.Y.).[4]

### 1. Inmate Grievances

Between the years 2010 through 2012, Plaintiff filed several grievances including Grievance No. CL-60783-11. *See generally* Dkt. No. 89-14, Deborah Jarvis Certified Records, dated Apr. 22, 2014.  On February 14, 2011, Plaintiff filed Grievance No. CL-60783-11 regarding Dr. Lee in order to "correct his deliberate indifference," and requested that he be provided with new medical boots, adequate treatment for his Hepatitis C, a renewed prescription for Ultram, a hand brace, and back brace.  Pl.'s Resp. in Opp'n, Ex. B(4)(1), Inmate Grievance Compl., dated Feb. 14, 2011.  On February 22, 2011, Plaintiff appealed the Inmate Grievance Resolution Committee's ("IGRC") Response.  Pl.'s Resp. in Opp'n, Ex. A(5)-A(6), IGRC Resp., dated Feb. 22, 2011.  On March 9, 2011, the Superintendent issued its determination concerning Grievance No. 60783-11.  Pl.'s Resp. in Opp'n, Ex. B(4)(2), Superintendent's Determination, dated Mar. 9, 2011.  The determination, in part, explained that the "Ultram medication was discontinued by Dr. Lee as the grievant

---

[4] The Complaint cites to *Dabney v. Lapolt,* 9:10-CV-00519 (GTS/DEP) (N.D.N.Y.), but the complaint in that case was filed on April 20, 2010, a month before the alleged May 21, 2010 assault. Dkt. No. 1-1, Compl. at ¶ 50. The Court presumes that Plaintiff was in fact referring to *Dabney v. Fisher*, 9:10-CV-1109 (GTS/TWD) (N.D.N.Y.).

had been caught hoarding the medication" and "there was no recommendation made for a back brace [or] hand brace [.]" *Id.* The determination also stated that the Plaintiff had been approved for medical boots, and that he would be scheduled for an evaluation to determine a course of treatment for his Hepatitis C. *Id.* Plaintiff did not appeal this determination. *See* Dkt. No. 89-15, Jeffrey Hale Decl., dated June 26, 2010, at ¶ 10 & Ex. A.

## 2. Deliberate Indifference

### a. Dr. Battu

Defendant Kalyana R. Battu is employed by the Office of Mental Health ("OMH") as a Psychiatrist at Great Meadow, and provided mental health care to Plaintiff while he was housed at Great Meadow. Dkt. No. 89-3, Kalyana R. Battu, M.D., Decl., dated June 13, 2014, at ¶¶ 1 & 3. On January 16, 2007, Plaintiff was transferred to Great Meadows with a level one mental health designation. Dkt. No. 90-2, James B. McGowan Decl., dated July 10, 2014, Ex. 2 at p. 1, CNYPC Chron. R. On or about March 8, 2010, Plaintiff's mental health service level designation was reassessed. Battu Decl. at ¶ 7. Based on the reassessment, his mental health level was changed to a two, and it was determined that he did not meet the criteria for the "serious mental illness," or an "S" designation. *Id.*; Dkt. No. 90-1, McGowan Ex. 1 at p. 2, Treatment Needs/Serv. Level Designation, dated Mar. 9, 2010. An "S"

designation requires a diagnosis of a major/serious mental illness and psychiatric instability for a minimum of six months.[5]  *Id.*  Plaintiff's psychiatric condition was "stable" during his confinement at Great Meadow.  Pl.'s Resp. in Opp'n, Ex. C(3), Physician's Orders, dated May 27, 2010, at Part IV.

At the time the reassessment was conducted, Plaintiff's medical record stated that he suffered from depressive disorder, posttraumatic stress disorder ("PTSD"), polysubstance dependance, and antisocial personality; none of which are entitled to an "S" designation.  McGowan Ex. 1 at pp. 6-7, Progress Notes, dated Jan. 29, 2010 & Feb. 28, 2010; Battu Decl. at ¶ 9; *see supra* note 7.  His psychiatric condition was also listed as stable at the time of the reassessment.  McGowan Ex. 1 at pp. 4 & 6-7, Progress Notes, dated Sept. 30, 2009, Jan. 29, 2010, & Feb. 28, 2010.

On June 4, 2010,  Plaintiff did not attend his sick call appointment scheduled with Dr. Battu.  McGowan Ex. 1 at p. 14, Progress Note, dated June 4, 2010.  On that date, upon reviewing Plaintiff's medical record, Dr. Battu determined that Plaintiff did not suffer from depressive episodes or PTSD.  *Id.*; Battu Decl. at ¶ 11.  As a result,

---

[5] Criteria for an "S" designation includes, a current diagnosis or recent significant history of any of the following types of Diagnostic and Statistical Manual IV (DSM-IV) Axis I diagnoses: (1) Schizophrenia (all sub-types); (2) Delusional Disorder; (3) Schizophreniform Disorder; (4) Schizoaffective Disorder; (5) Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal); (7) Psychotic Disorder Not Otherwise Specified; (8) Major Depressive Disorders; (9) Bipolar Disorder I and II; or been actively suicidal or who have engaged in a recent, serious suicide attempt; or diagnosed with a serious mental illness, and psychiatric instability for a minimum of six months.  N.Y. CORRECT. LAW § 137(e); Dkt. No. 89-13, JoAnne Waldron Decl., dated July 1, 2014, at ¶ 8.

PTSD and depression were removed from Plaintiff's Diagnosis Record. McGowan Ex. 1 at p. 1, Diagnosis R., dated June 4, 2010. In addition, Dr. Battu asked staff to submit paperwork to assist him with reassessing Plaintiff's eligibility for an "S" designation as Plaintiff had been asking for reconsideration of his detention in SHU. McGowan Ex. 1 at p. 14, Progress Note, dated June 4, 2010; *see* Battu Decl. at ¶¶ 13-14.

### b. Donohue

Defendant Virginia Donohue is employed by the Office of Mental Health as a Social Worker at Great Meadow. Dkt. No. 89-5, Virginia Donohue Decl., dated June 12, 2014, at ¶ 1. On June 28, 2010, Donohue filled out the Termination Transfer Progress Note ("Transfer Note") based on Plaintiff's medical records. *Id.* at ¶ 3 & 11. The Transfer Note, in part, indicated that Plaintiff required level two OMH services, and that his psychiatric condition was "stable per chart review." McGowan Ex. 1 at p. 26, Termination Transfer Progress Note [hereinafter "Transfer Note"]; Donohue Decl. at ¶ 12. The Transfer Note also recommended that Plaintiff continue receiving mental health services, and advised of the recent change to Plaintiff's service level designation and Great Meadow's intention of reassessing Plaintiff's eligibility for the "S" designation. Transfer Note. On July 1, 2010, Plaintiff was transferred to Clinton's SHU. Waldron Decl. at ¶ 5; Compl. at ¶¶ 42-43.

### c. *Waldron, Berggren, and Nephew*

Defendant Jean Berggren is employed by OMH as a Psychiatrist at Clinton, and was a member of Plaintiff's Clinton mental health treatment team. Dkt. No. 89-4, Jean Berggren, M.D., Decl., dated June 24, 2014, at ¶ 1 & 3. Defendant JoAnne Waldron is employed by OMH as the Mental Health Unit Chief at Clinton. Waldron Decl. at ¶ 1. Defendant Sarah L. Nephew is employed by OMH as the Residential Crisis Treatment Program ("RCTP") Coordinator at the OMH Satellite Unit of the Central New York Psychiatric Center ("CNYPC") at Clinton. Dkt. No. 89-10, Sara L. Nephew Decl., dated June 24, 2014, at ¶¶ 1 & 3.

The RCTP is intended to house inmates in need of immediate mental health treatment. *Id.* at ¶ 8. Inmates may also be placed in the Program for observation and/or a mental health evaluation. *Id.*

On July 1, 2010, the day Plaintiff was transferred to Clinton's SHU, the health services staff noted that he had been receiving mental health level two services. Waldron Decl. at ¶ 5. The next day, on July 2, 2010, the health services staff conducted an assessment of Plaintiff's mental health condition. McGowan Ex. 2 at p. 73, SHU Mental Health Assessment, dated July 2, 2010. Based on that assessment, Plaintiff's mental health level remained designated as a two. *Id.*; Waldron Decl. at ¶ 13; McGowan Ex. 2 at p. 1, CNYPC Chron. R. Plaintiff received several more mental

health assessments during his time in SHU, all which affirmed that Plaintiff did not exhibit behaviors consistent with an "S" designation. Waldron Decl. at ¶¶ 18-20; *see also* Dkt. No. 90-3, McGowan Ex. 3, Patient Lt. Email, dated Aug. 9, 2010; McGowan Ex. 2 at p. 37, RCTP Monitoring Chart, dated Nov. 15, 2010. At Clinton, Plaintiff received direct mental health treatment in accordance with his level two treatment plan. Waldron Decl. at ¶ 40. His medical record reflects frequent mental health assessments. Berggren Decl. at ¶ 9; McGowan Ex. 2 at p. 1, CNYPC Chron. R. At least twice per month, he was scheduled to meet with a primary therapist, and, once a month, he was scheduled to meet with a psychiatrist. Waldron Decl. at ¶ 40. Plaintiff also had daily access to nurses during their daily rounds in SHU. *Id.*; Dkt. No. 89-6, Ronald Dumont, R.N., Decl., dated July 1, 2014, at ¶ 3. Plaintiff was placed in RCTP twice because he was threatening to harm himself and was refusing to eat. Waldron Decl. at ¶ 24; McGowan Ex. 2 at p. 1, CNYPC Chron. R.

Plaintiff's mental health condition significantly improved during his stay at Clinton. Waldron Decl. at ¶ 39. On June 20, 2011, approximately a year after being admitted to Clinton, Plaintiff's mental health level was updated to a level three. McGowan Ex. 2 at p. 1, CNYPC Chron. R. On August 17, 2011, his mental health service level was changed to a six. *Id.* From that date forward, while in Clinton's custody, Plaintiff remained classified as a level six. *Id.*

### d. Sawyer

During the relevant time period, Defendant Donald Sawyer worked for OMH and served as the Executive Director of CNYPC. Dkt. No. 89-12, Donald Sawyer, Ph.D., MBA, Decl., dated June 24, 2014, at ¶ 2. He was neither responsible for direct day-to-day patient care nor followed-up on inmate complaints. *Id.* at ¶ 3. In the ordinary course of business, complaints addressed to the Executive Director are redirected by support staff to the CNYPC Quality Assurance Office. *Id.* at ¶ 8.

Plaintiff wrote a letter, dated August 5, 2010, addressed to the "Director of Mental Health," complaining that he was falsely "written up and place[d] in the SHU," receiving "inadequate mental health treatment," and that the "[Defendants] are adamant in refusing to put [him] in a program that could help [him]." Plaintiff's letter was redirected to Risk Management[6] and his complaint was promptly investigated. McGowan Ex. 3, Dabney Lt., dated Aug. 5, 2010.

### e. Dr. Farooki

Defendant Tahir R. Farooki is employed by DOCCS as a Dentist at Clinton. Dkt. No. 89-7, Tahir R. Farooki Decl., dated Apr. 14, 2014, at ¶ 1. On August 6, 2010, Dr. Farooki met with Plaintiff, evaluated his tooth, and determined that it was "broken

---

[6] It appears that Risk Management is CNYPC's Quality Assurance Office, or a subdivision of that Office. *See generally* McGowan Ex. 3, Dabney Lt., dated Aug. 5, 2010; Dkt. No. 89-12, Donald Sawyer, Ph.D., MBA, Decl., dated June 24, 2014, at ¶ 8.

down and abessed [sic]." *Id.* at ¶ 4. Dr. Farooki took an x-ray of the infected tooth and determined that it required an extraction. *Id.* at ¶¶ 5-7. Dr. Farooki ordered Plaintiff to take Penicillin for ten days to address the infection and prescribed Motrin for pain. Farooki Decl., Ex. A, Dental Treatment R.; Compl. at ¶ 53. Dr. Farooki scheduled Plaintiff to have his tooth extracted by Dr. Oliviera, another dentist at the facility. Farooki Decl. at ¶ 7 & Ex. A, Dental Treatment R. Dr. Farooki routinely assigns extractions and other dental interventions to other dentists in the facility due to the "volume of patients and breadth of [his] responsibilities at Clinton[]." Farooki Decl. at ¶ 8.

On November 19, 2010 and November 26, 2010, Plaintiff submitted sick-call slips complaining that his infected tooth required an extraction. Dkt. No. 89-17, James B. McGowan Decl., Ex. A, Bartram Yihni Dabney, Dep., Jan. 30, 2014, at p. 90. Plaintiff alleges that Nurse Dumont discarded his sick-call slips, in which he requested follow-up dental care. Compl. at ¶ 53. Dr. Farooki was unaware of Plaintiff's intervening complaints and did not see the Plaintiff at any time prior to January 5, 2011, when his tooth was extracted by another dentist at the facility. Farooki Decl. at ¶¶ 9 & 12 & Ex. A, Dental Treatment R.

### f. Nurse Dumont

SHU inmates have access to nurses during daily sick call rounds. Dumont Decl.

at ¶ 2.  In addition to daily sick call rounds, SHU inmates have access to emergency sick call twenty-four hours, seven-days-a-week.  *Id.* at ¶ 3.  During the relevant time period, Nurse Ronald Dumont generally conducted sick call rounds in SHU.  *Id.* at ¶¶ 2 & 7.  Defendant Dumont maintains that he was unaware of any serious health care issue that was not being appropriately addressed by the health care staff.  *Id.* at ¶ 9.  Nurse Dumont did not see Plaintiff on November 19, 2010 or November 26, 2010 — the days Plaintiff claims to have submitted his sick call slips seeking dental attention.  *Id.* at ¶ 8; Dabney Dep. at p. 90.

### g.  Dr. Lee

Defendant Kang Lee is a Physician at Clinton, and he provided medical care to Plaintiff during his incarceration at Clinton.  Dkt. No. 89-9, Kang Lee, M.D., Decl., dated June 30, 2014, at ¶¶ 1 & 3. On August 26, 2010, Plaintiff met with Dr. Lee and complained about his neck and back pain.  Dkt. No. 90-4, McGowan Ex. 4 at p. 26, Physical Examination, dated Aug. 26, 2010.[7]  On examination, Dr. Lee found that Plaintiff suffered from mild arthritis but otherwise had a normal physical.  *Id.*; Lee Decl. at ¶ 5.  Dr. Lee prescribed Naproxen and Ultram for pain, in addition to other medications.  Lee Decl. at ¶ 5.  On October 18, 2010, Plaintiff was temporally denied

---

[7] Due to the volume of records contained in Dkt. No. 90-4, the Court will refer to the page numbers automatically assigned by this Court's Case Management Electronic Case Files System when citing to documents therein.

his back brace while pending an assessment of his mental health condition.[8]  *Id.* at ¶

10.  Dr. Lee denied Plaintiff's request for a hand brace because "he had good range of

motion, no swelling or other deformity of the hand."  *Id.* at ¶ 7.  Dr. Lee denied

Plaintiff's request for medical boots because he "was fully ambulatory and no limping

was noted," and walked minimal distances due to his confinement in SHU.  *Id.* at ¶ 8.

Dr. Lee contemplated treating Plaintiff's Hepatitis C infection with antiviral

medication.  *Id.* at ¶ 12; *see also* McGowan Ex. 4 at p. 59, Request & Report of

Consultation, dated Feb. 28, 2011.  Antiviral medication is effective when treatment

is continuous.  Lee Decl. at ¶ 13.  A long course of antiviral medication is also known

for increasing symptoms of depression in patients.  *Id.* at ¶ 14.  Because Dr. Lee was

aware of Plaintiff's history of polysubstance dependance, manipulative behaviors, and

depression, he requested a psychiatric consultation on February 28, 2011, in order to

determine whether Plaintiff was fit to start an antiviral treatment.  Request & Report

of Consultation; Lee Decl. at ¶¶ 12, 15, & 18.  On March 7, 2011, the psychiatrist

concluded that Plaintiff could become depressed while on such a treatment regimen,

and advised that if Plaintiff were prescribed the antiviral treatment, he should be

closely monitored for signs of depression.  Request & Report of Consultation.  On

March 4, 2011, Plaintiff was informed of the planned treatment for his Hepatitis C, and

---

[8] It appears that physicians working at Clinton are mindful that inmates, from time to time, modify materials provided to them solely for treatment and convert those items into weapons. Lee Decl. at ¶ 9.

that anti-depressants would be provided if he developed depression during the course of his treatment. Dkt. No. 90-4, McGowan Ex. 4 at p. 60, Refusal of Medical Examination and/or Treatment, dated Mar. 4, 2011. Plaintiff demanded that he receive anti-depressant medication as a precursor to treatment. *Id.* Dr. Lee declined to issue Plaintiff anti-depressants as Plaintiff did not have symptoms of depression. Lee Decl. at ¶ 18. As a result, Plaintiff refused the Hepatitis C treatment plan. Refusal of Medical Examination and/or Treatment; Lee Decl. at ¶¶17 & 19.

On September 16, 2010, Plaintiff was caught hiding Ultram. Dkt. No. 90-4, Ambulatory Health Record [hereinafter "AHR"] Progress Note, dated Sept. 16, 2010, at p. 15. Plaintiff held onto the pills so that he could "cut up and bleed out" and "not feel the pain[.]" Compl. at ¶ 54. On September 16, 2010, Dr. Lee ordered Plaintiff's Ultram to be crushed. AHR Progress Note at p. 15. Dr. Lee discontinued Plaintiff's Ultram prescription on November 3, 2010. AHR Progress Note, dated Nov. 3, 2010, at p. 10. It appears that Dr. Lee discontinued Plaintiff's Ultram prescription because he continued to abuse Ultram, had access to other pain medication, and his situation was complicated by his antisocial personality disorder and polysubstance abuse. Lee Decl. at ¶ 21.

## C. Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") imposes several restrictive

conditions on the ability of prisoners to maintain federal civil rights actions. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of administrative remedies is required even when the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided that the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright*, 2002 WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner*, 531 U.S. 731 (2002)). In *Woodford v. NGO*, the Supreme Court stated that to properly exhaust administrative remedies prisoners must "compl[y] with an agency's deadlines and other critical procedural rules [.]" 548 U.S. 81, 90 (2006). The rules are "defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Id*. "The level of detail necessary in a grievance

to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*.

New York State's administrative remedies consist of a three-step review process. First, a grievance is submitted to IGRC, a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

Here, Plaintiff failed to exhaust his available remedies with regard to his claims

against the DOCCS Defendants[9] as he did not submit any grievances relating to the issues raised in this action, except for one grievance filed regarding Dr. Lee. Although Plaintiff filed a grievance against Dr. Lee, he did not appeal the superintendent's determination. While it may be true that Plaintiff did not need to appeal the favorable aspects of that decision, namely, approval for medical boots and treatment plan for his Hepatitis C, he certainly had to appeal the decision as it failed to resolve his deliberate indifference allegation against Dr. Lee. Nevertheless, due to the extensive procedural history and the number of Defendants involved in this action, the Court will address all of Plaintiff's claims on the merits.

### D. Deliberate Indifference

To state an Eighth Amendment claim for denial of adequate medical or mental health care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) (concluding that "psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble*, [] that it must be provided to prisoners."). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind'

---

[9] "Defendants do not assert failure to exhaust with respect to those defendants employed by the Office of Mental Health: Defendants Sawyer, Battu, Donohue, Nephew, Waldron, and Berggren." Dkt. No. 89-1, Defs.' Mem. of Law at p. 4 n.1.

or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin* ("*Hathaway I*"), 37 F.3d 63, 66 (2d Cir. 1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with

*-21-*

reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

Here, Defendants do not dispute that Plaintiff suffers from a serious medical condition. *See generally* Dkt. No. 89-1, Defs.' Mem. of Law. Thus, the Court will address whether the Defendants have acted with deliberate indifference.

### 1. Mental Health

#### a. Dr. Battu

Plaintiff alleges that Dr. Battu and Social Worker Donohue falsified his medical record. Compl. at ¶ 34. Setting aside Plaintiff's allegation, the record indicates that Dr. Battu assessed Plaintiff's mental health condition, and concluded that he did not meet the criteria for an "S" designation. In addition, Dr. Battu was unaware of any

symptoms or behaviors that would entitle Plaintiff to an "S" designation. Battu Decl. at ¶¶ 7-8. Moreover, Plaintiff has failed to produce evidence that he was in fact entitled to an "S" designation at the time Dr. Battu conducted his assessment. Thus, the Court recommends **dismissing** the deliberate indifference claim against Dr. Battu.

### b. Donohue

Defendant Donohue merely relied on OMH's medical record, which, at the time, indicated that Plaintiff was designated at mental health level two, in order to fill out Plaintiff's Transfer Note in preparation for Plaintiff's transfer to Clinton. Donohue Decl. at ¶ 9. And, indeed, the Transfer Note received by Clinton stated that Plaintiff required mental health level two services. Thus, there is no merit to Plaintiff's allegation that Defendant Donahue falsified his medical record. As a result, this Court recommends **dismissing** Defendant Donohue from this action.

### c. Waldron, Berggren, Nephew, and Sawyer

Plaintiff contends that OMH Defendants Sawyer, Waldron, Berggren, and Nephew acted with deliberate indifference towards his mental health condition. Detrimental to Plaintiff's argument is that he in fact received adequate mental health treatment while in Clinton. For instance, the Clinton OMH team exhibited care and diligence by conducting an assessment the day after Plaintiff was admitted to Clinton, despite receiving Great Meadow's recent assessment of Plaintiff's mental health

condition. Clinton's reassessment confirmed that Plaintiff required mental health level two treatment. Additionally, due to Plaintiff's repeated complaints that he qualified for the "S" designation and thus should be removed from SHU, he was further evaluated on several occasions. None of the subsequent assessments indicated that he was eligible for the "S" designation. Nonetheless, the Plaintiff was removed from SHU and twice temporally placed in RTCP as the OMH Defendants were concerned with his threats of self-harm and refusal to eat. Moreover, Plaintiff's mental health condition greatly improved while in the care of Clinton's OMH professionals. Thus, the Court recommends **granting** Defendants' Motion for Summary Judgment as to Plaintiff's deliberate indifference claim against Defendants Waldron, Berggren, and Nephew.

As a consequence, the Court also recommends **dismissing** Defendant Sawyer, Executive Director of CNYPC, from this action as Plaintiff cannot sustain his theory of supervisory liability because Plaintiff has not established that any of the OMH Defendants violated his Eighth Amendment right. *Hinton v. Prack*, 2014 WL 4627120, at *10 (N.D.N.Y. Sept. 11, 2014) (citing to *Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability").

## 2. Physical Health

### a. Dr. Lee

The record demonstrates that Dr. Lee was taking into account Plaintiff's overall physical and mental well-being while Plaintiff was in his care. In addition, Dr. Lee provided Plaintiff with an adequate course of treatment for his Hepatitis C, which the Plaintiff refused. Dr. Lee declined to issue Plaintiff a hand brace because he "had good range of motion, no swelling or other deformity of the hand." Lee Decl. at ¶ 7. Dr. Lee also declined to issue medical boots because Plaintiff "was fully ambulatory and no limping was noted," and walked minimal distances due to his confinement in SHU. *Id.* at ¶ 8. A prison doctor's denial of unnecessary medical aids does not support an Eighth Amendment claim as it is antithetical of medical conduct that evinces a mental state similar to criminal recklessness. *See Wilson v. Seiter*, 501 U.S. at 301-03. Lastly, Dr. Lee discontinued Plaintiff's Ultram pain medication when it was discovered that Plaintiff was hoarding the medication to possibly overdose himself. Based on these uncontested facts, the Court recommends **dismissing** Plaintiff's deliberate indifference claim against Dr. Lee.

### b. Nurse Dumont

Plaintiff's allegation that Nurse Dumont discarded some of his medical slips is highly speculative. The Plaintiff acknowledges that Nurse Dumont is not the only

nurse or staff member in charge of collecting sick call slips. Dabney Dep. at p. 100. Plaintiff merely states that he knows that Nurse Dumont discarded his medical slips because he did not receive the medical items or treatment sought in the medical slips. *Id.* at p. 101. With respect to the allegation that Dumont discarded his sick call slips seeking dental intervention, Plaintiff fails to allege that he spoke with or handed Nurse Dumont his medical slip on November 19, 2010, or November 26, 2010. More significantly, Nurse Dumont did not see the Plaintiff on the dates he claims to have submitted his two sick call slips seeking dental assistance. Dumont Decl. at ¶ 8. Thus, the Court recommends **dismissing** Plaintiff's deliberate indifferent claim against Nurse Dumont.

### c. Dr. Farooki

Plaintiff alleges Dr. Farooki acted with deliberate indifference when he failed to pull out his infected tooth. *See* Compl. at ¶ 53. Defendants raise qualified immunity as an affirmative defense. Defs.' Mem. of Law at p. 15. The doctrine of qualified immunity protects governmental officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Messerschmidt v. Millender*, _ U.S. _, 132 S.Ct. 1235, 1244 (2012). Qualified immunity gives governmental officials "breathing room to make reasonable but mistaken judgments," and "protects all but the

plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, _

U.S. _, 131 S.Ct. 2074, 2085 (2011) (citation omitted); *Jackler v. Byrne*, 658 F.3d 225,

243 (2d Cir. 2011) (Making "a mere mistake in the performance of an official duty

may not deprive the office of [this] defense."). Determining whether qualified

immunity may apply is a two-pronged inquiry: (1) whether the official violated a

statutory or constitutional right; and (2) and whether the right was clearly established

at the time of the challenged conduct. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir.

2012). Recently, the United States Supreme Court relieved courts from having to

decide sequentially the more difficult question of whether the facts alleged or shown

by plaintiff make out a violation of a constitutional right before determining whether

the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)

(holding that the protocol mandated in *Saucier v. Katz*, 533 U.S. 194 (2001) should not

be "regarded as an inflexible requirement," but may be considered if a court wishes).

With the rigid *Saucier* procedure being alleviated, courts now have the discretion to

decide which of the two prongs of this analysis "to tackle first." *Coollick v. Hughes*,

699 F.3d at 219.

In order for a constitutional right to be clearly established, it must be defined

with reasonable specificity, as established by both Supreme Court and Second Circuit

law, and sufficiently clear that a reasonable official would have understood that the

conduct at issue is unlawful under the existing law.  *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (citations omitted); *Reichle v. Howards*, _ U.S. _, 132 S.Ct. 2088, 2093 (2012).  A right must be clearly established "not as a broad general proposition . . . but in a particularized sense so that the contours of the right are clear to a reasonable official," and that existing precedents have placed it "beyond debate." *Reichle v. Howards*, 132 S.Ct. at 2093 & 2094 (internal quotation marks and citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 753 (2002) ( noting that contours of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").  If the conduct does not violate a clearly established constitutional right, or, "if it was objectively reasonable for the official to believe that his conduct did not violate such a right, then the official is protected by qualified immunity." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).  Or, conversely, if officers of reasonable competence could disagree that such conduct was unlawful, then qualified immunity should be recognized. *Hope v. Pelzer*, 536 U.S. at 752 (citing *Malley v Briggs*, 475 U.S. 335, 341 (1986)).

Here, Dr. Farooki is entitled to qualified immunity.  Dr. Farooki x-rayed Plaintiff's infected tooth, determined it required an extraction, prescribed Penicillin for ten days to address the infection, and prescribed Motrin for pain.  Dr. Farooki did not extract the tooth on the date he examined Plaintiff because the infection had to be

treated before an extraction could be performed. However, Dr. Farooki relied on Dr. Oliviera, a dentist not named in this suit, to perform the extraction. Dr. Farooki routinely assigns extractions and other dental treatments to other dentists within Clinton due to the "volume of patients and breadth of [his] responsibilities[.]" Farooki Decl. at ¶ 8. There is no evidence suggesting that Farooki was aware of a delay in dental services to Plaintiff. In addition, there is no evidence suggesting that Dr. Farooki should have known that he could not have reasonably rely on Dr. Oliviera to perform the extraction in a timely manner. Neither the Supreme Court nor the Second Circuit have announced that medical professionals cannot reasonably rely on support staff or other members of a medical/dental treatment team, or that doing so constitutes deliberate indifference. Because Dr. Farooki is entitled to qualified immunity, the Court recommends **dismissing** Dr. Farooki from this action.

### E. Conspiracy

Plaintiff contends that Drs. Battu and Waldron conspired to deny his constitutional rights in violation of 42 U.S.C. § 1985. The only relevant section of that statute is subsection (3) which states, in pertinent part:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . , if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby

another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To recover under this section, a plaintiff must show the existence of (1) a conspiracy (2) meant to deprive a person or persons of the equal protection of the laws or privileges and immunities under the laws with (3) "an overt act in furtherance of the conspiracy[,] (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States[,]" and (5) "some racial or perhaps otherwise class-based, invidious discriminatory animus[.]" *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citations omitted). A claim of conspiracy under this subsection must include more than conclusory allegations. *Dwares v. City of New York*, 985 F.2d 94, 99-100 (2d Cir. 1993) *overruled on other grounds*, *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993).

Plaintiff's conspiracy claim fails for two reasons. One, Plaintiff summarily alleges that Defendants Battu and Waldron conspired to deny him adequate mental health treatment, but provides no other facts, or even circumstances, from which this Court can surmise that any such conspiracy occurred. Two, the Court finds that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. "[T]he

intracorporate conspiracy doctrine, which provides that officers, agents, and employees of a single corporate entity are legally incapable of conspiring together[,]" applies to § 1985 conspiracy claims. *Orafan v. Goord*, 411 F. Supp. 2d 153, 164-65 (N.D.N.Y. 2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCCS officials and employees acting within the scope of their employment), *vacated on other grounds*, 249 F. App'x 217( 2d Cir. 2007) (internal citations and quotations omitted); *see also Scott v. Goord*, 2004 WL 2403853, at *13 (S.D.N.Y. Oct. 27, 2004). Thus, Defendants Battu and Waldron are legally incapable of committing a conspiracy as they are both employed by the New York State Office of Mental Health and were acting within in the scope of their employment. We therefore recommend **granting** Defendants' Motion for Summary Judgment as to Plaintiff's conspiracy allegation against Battu and Waldron.

### F. Failure to Protect

Section 1986 applies to "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured[.]" 42 U.S.C. § 1986. A § 1986 claim is predicated upon a valid § 1985 claim. *Brooks v. County of Nassau*, 2014 WL 5093277 at *4 (Oct. 9, 2014)

*-31-*

(citations omitted).

Accordingly, since Plaintiff has failed to establish a conspiracy claim under Section 1985, Plaintiff has likewise failed to state claim under Section 1986. *Webster v. Fisher*, 694 F. Supp. 2d 163, 196 (N.D.N.Y. 2010) *aff'd*, 398 F. App'x 683 (2d Cir. 2010).

## G. Retaliation

Lastly, Plaintiff alleges that OMH Defendants provided him with inadequate mental health treatment in retaliation for filing *Dabney v. Fisher*, 9:10-CV-1109, on September 9, 2010, against eighteen Great Meadow officials, which included a few OMH employees. Compl. at ¶¶ 34 & 47. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Central to such claims is the notion that in a prison setting, correction officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v.*

*Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted); *Dawes v. Walker*, 239

F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*,

534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a

prison official — even those otherwise not rising to the level of a constitutional

violation — can be characterized as a constitutionally proscribed retaliatory act."

(citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate

(1) he or she was engaged in constitutionally protected activity, (2) the defendant took

adverse action against the plaintiff, and (3) there was a causal connection between the

protected activity and the adverse action in that the alleged conduct was substantially

motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d at 380 (citing *Dawes

v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir.

2002).

The plaintiff bears the initial burden in showing that the defendant's actions

were improperly motivated. *Scott v. Coughlin*, 344 F.3d at 288.  In situations where

the defendant's actions are the result of both retaliatory and legitimate reasons, the

burden shifts to the defendants to show that they would have taken the same action

absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*,

*Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977) & *Lowrance v. Achtyl*,

20 F.3d 529, 535 (2d Cir. 1994)).

To be sure, Plaintiff's September 9, 2010 federal filing constitutes protected speech. However, Plaintiff cannot demonstrate that any adverse action has been taken against him by the OMH Defendants. Instead the evidence demonstrates that at all times Plaintiff was provided with adequate mental health treatment. *See supra* Part II.D. Thus, it cannot be said that such detailed and attentive mental health treatment "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). In any event, Defendants have sufficiently demonstrated that they made medical decisions and diagnoses absent a retaliatory motive. Lastly, we find it unnecessary to address Defendants' argument concerning Defendant Nocera since Plaintiff did not a raise a retaliation cause of action against him. *See generally* Compl.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 89) be **GRANTED** in its entirety and the case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date: February 24, 2015
       Albany, New York

Randolph F. Treece
U.S. Magistrate Judge